**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

City of Minneapolis,

            Plaintiff,

    v.

Time Warner Cable, Inc., and KBL
Cablesystems of Minneapolis
Limited Partnership,

            Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 05-994 ADM/AJB

_____

Michael R. Bradley, Esq. and Stephen J. Guzzetta, Esq., Bradley & Guzzetta, LLC, St. Paul, MN, and Peter W. Ginder, Deputy City Attorney, Minneapolis, MN, argued for and on behalf of Plaintiff.

Randall Tietjen, Esq., Robins, Kaplan, Miller & Ciresi LLP, Minneapolis, MN, and Henk Brands, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C., argued for and on behalf of Defendants.

_____

## I. INTRODUCTION

On August 9, 2005, oral argument before the undersigned United States District Judge was heard on Plaintiff City of Minneapolis' ("Plaintiff" or "Minneapolis") Motion to Remand [Docket No. 22] and Defendants Time Warner Cable, Inc. ("Time Warner Cable") and KBL Cablesystems of Minneapolis Limited Partnership's ("KBL") (collectively, "Defendants") Motion to Dismiss [Docket No. 7]. In its Complaint [Docket No. 1], Plaintiff alleges that an agreement between the parties requires Defendants to pay Plaintiff five per cent of its revenues derived from Defendants' cable modem services. Additionally, Plaintiff alleges Defendants have wrongfully converted system capacity in violation of the agreement. Because diversity jurisdiction exists and the forum selection clause allows this suit to be maintained in the Minnesota federal courts, Plaintiff's Motion to Remand is denied. Further, because federal law

preempts Plaintiff's demand for revenues and because Plaintiff has failed to state a valid

conversion claim, Defendants' Motion to dismiss is granted.

## II.  BACKGROUND

**A.      The Franchise Agreement**

In 1979, Minneapolis and the predecessor to Time Warner Cable entered into an

agreement (the "Franchise Agreement") (Compl. Ex. A) granting permission to Time Warner

Cable to use public rights-of-way to provide cable services.  In exchange for permission to use

public rights-of-way, including utility poles and burying cable under city streets, the Franchise

Agreement requires payment of a "franchise fee of five (5) per cent of the company's gross

annual revenues."  Franchise Agreement, Art. I, § 9(a).  "Gross annual revenues" are defined by

the Franchise Agreement as "all revenue derived directly or indirectly by the company . . . from

or in connection with the operation of the cable communications system."  Id. at § 2(p).  The

figure of five per cent is derived from an FCC order issued in 1972 limiting franchise fees to five

percent of an operator's gross revenues, thereby preempting clauses calling for fees in excess of

five per cent.  *Cable Television Report & Order*, 36 F.C.C.2d 143, ¶ 186 (1972).  In 1984,

Congress codified the five per cent cap by amending the Communications Act to reflect the

FCC's previous orders.  47 U.S.C. § 542(b).  In 1996, Congress passed the Telecommunications

Act, which encouraged cable operators to provide services beyond traditional cable television

services.  The five per cent cap on franchise fees remained intact; however, the

Telecommunications Act limited the collection of franchise fees to a "cable operator's gross

revenues derived . . . from the operation of the cable system to provide *cable services*."  Id.

(emphasis added).

In 1998, cable operators began offering cable modem service, which provides high speed internet access to residential properties. In response, municipalities across the country began requesting five per cent payment on revenues derived from cable modem services. On March 14, 2002, the FCC issued a ruling determining that "cable modem as currently provided is . . . not a cable service." *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd. 4798, ¶ 33 (2002) (the "FCC Ruling"). The FCC Ruling further found that cable modem services are an information service, as opposed to a cable service. Id. ¶ 105. As a result of the FCC Ruling, Time Warner Cable began withholding payments to Minneapolis on revenues derived from cable modem services. As a precursor to this suit, on April 21, 2005, Minneapolis sent Time Warner Cable a Violation Notice, demanding payment on Time Warner Cable's cable modem service revenues. The Complaint was filed on April 25, 2005.

In addition to the claim for a percentage of Time Warner Cable's revenues derived from cable modem services, the Complaint alleges Time Warner Cable converted Public, Education, and Governmental ("PEG") channels for its own use. Prior to the existence of the Franchise Agreement, FCC regulations required cable operators to provide three channels for each of the three PEG subject areas. 47 C.F.R. § 76.254(a). Additionally, FCC regulations stated that if local demand was sufficiently high, cable operators could be required to make available additional PEG channels. 47 C.F.R. § 76.254(d). The 1984 Cable Act codified these regulations, although it did not specify the number of channels to be used for PEG purposes. 47 U.S.C. § 531. The Franchise Agreement calls for three PEG Channels. Franchise Agreement, Art. III,  § 9(a). The Franchise Agreement also states that in the case of sufficient demand, more

channels may be required to be provided.  Id. at § 9(b).  Additionally, the Franchise Agreement established the Minnesota Telecommunications Network to administer the PEG channels and provided that twenty five per cent of the residential network's channel capacity, in addition to the three PEG channels, would be dedicated to public use.  Id. at § 8(f)(4).  Minneapolis' second claim alleges that Defendants have failed to provide the additional channel capacity as required by this provision of the Franchise Agreement.

**B.      Citizenship of the Parties**

Minneapolis, a municipal corporation, is a Minnesota citizen.  Notice of Removal [Docket No. 1] ¶¶ 1, 8.  Time Warner Cable is a Delaware Corporation who maintains its principal place of business in Connecticut.  Id. ¶¶ 2, 8.  The citizenship of KBL, however, is a more complicated question, and is central to resolving the diversity of citizenship issue raised by Minneapolis' Motion to Remand.

In 1995, Time Warner Cable's parent company acquired control over KBL.  At that time, the KBL limited partnership was organized as follows: KBL Cablesystems of Minneapolis, Inc., owned a 96.1% general partnership interest; KBL Cable TV, Inc. owned a 1.25% limited partnership interest; and the remaining 2.64% limited partnership interest was owned by other parties unrelated to KBL or Time Warner Cable.  Tietjen Decl. [Docket No. 44] ¶ 2, Ex. 1.

In 2002, Time Warner Cable's parent company consolidated its interests in KBL into Time Warner Cable.  First, Time Warner Cable asked for and received approval from Minneapolis of its plan to transfer the general partnership interest of KBL Cablesystems of Minneapolis, Inc. and the limited partnership interest of KBL Cable TV, Inc. to Time Warner Cable.  Id. ¶ 5, Ex. 4.  This strategy was completed on April 19, 2005, when Time Warner Cable

finalized the acquisition of KBL Cablesystems of Minneapolis, Inc. and KBL Cable TV, Inc.  Id.
¶ 7, Ex. 6.  Additionally, in late 2004, Time Warner Cable acquired the remaining 2.64% limited
partnership interest.  Id. ¶ 6, Ex. 5.  Following the completion of the integration strategy in April
2005, Time Warner Cable informed Minneapolis of the transactions.  Id. ¶¶ 8-9, Exs. 7-8.

### III. DISCUSSION

**A.      Standard of Review**

"Except as otherwise expressly provided by Act of Congress, any civil action brought in
a State court of which the district courts of the United States have original jurisdiction, may be
removed by the defendant or the defendants, to the district court of the United States for the
district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  A
notice of removal requires only a "short and plain statement of the grounds for removal," but
does not specifically require a jurisdictional showing.  28 U.S.C. § 1446(a).  If a plaintiff
disagrees with statements made in removal position, the plaintiff may challenge them in District
Court.  See Quick Erectors, Inc. v. Seattle Bronze Corp., 524 F. Supp. 351, 354 (D.C. Mo. 1981)
(citing Wilson v. Republic Iron & Steel Co., 257 U.S. 92 (1921)).  The existence of jurisdiction
must be supported by a preponderance of the evidence.  Altimore v. Mount Mercy College, 420
F.3d 763, 768 (8th Cir. 2005).

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to
dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P.
12(b)(6).  In considering a motion to dismiss, the pleadings are construed in the light most
favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.
Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870,

879-80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be

resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.  Dakota Indus., Inc. v.

Dakota Sportswear, Inc. 946 F.2d 1384, 1387 (8th Cir. 1991).  "A motion to dismiss should be

granted as a practical matter . . . only in the unusual case in which the plaintiff includes

allegations that show on the face of the complaint that there is some insuperable bar to relief."

Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).

**B.      Motion to Remand**

In its Motion to Remand, Minneapolis claims the requirements of diversity jurisdiction

are absent in the instant case, requiring remand to the state court of Hennepin County.

Specifically, Minneapolis avers that KBL is not diverse.[1]  Additionally, Minneapolis avers that a

forum selection clause mandates remand to Minnesota state courts.  Contrary to Minneapolis'

assertions, however, this Court finds that KBL is not a citizen of Minnesota, and the forum

selection clause does not require remand.

**1.      Diversity Jurisdiction**

Minneapolis submits that inconsistent information from the Defendants, combined with

information received from the Minnesota Secretary of State, demonstrates that KBL is a

Minnesota citizen, and therefore not diverse.  It is well established that complete diversity exists

when no defendant holds citizenship in a state where any plaintiff holds citizenship at the time of

the lawsuit's filing.  Capitol Indem. Corp. v. Russellville Steel Co., Inc., 367 F.3d 831, 835 (8th

---

[1] Although Minneapolis initially maintained that Defendants could not demonstrate that
the amount in controversy was in excess of $75,000, as required for diversity jurisdiction,
Minneapolis agreed at oral argument that the case does, indeed, meet the minimum dollar
amount for jurisdictional purposes.

Cir. 2003).  The citizenship of a corporation is determined by the state in which it is

incorporated, as well as the state in which it maintains its principal place of business.  Id.  The

citizenship of a limited partnership, on the other hand, is determined by the citizenship of each of

its partners.  CarAlumax Mill Prods, Inc. v Congress Fin. Corp., 912 F.2d 996, 1003 (8th Cir.

1990).  Both parties agree that Plaintiff is a citizen of Minnesota, and Time Warner Cable is a

citizen of both Delaware and Connecticut, based on its state of incorporation and principal place

of business.  The pivotal question, therefore, is the citizenship of the KBL partners on April 25,

2005, the day the instant suit was filed.

KBL claims that since April 19, 2005, Time Warner Cable has been the sole general and

limited partner in KBL – and therefore, it also is a citizen of Delaware and Connecticut.

Although Plaintiff offers historical evidence to the contrary, none of the proffered evidence

demonstrates that anyone other than Time Warner Cable was a partner in KBL as of the filing

date of this suit.  The first piece of evidence Minneapolis cites is a letter dated March 30, 2005,

from Time Warner Cable which incorrectly indicated that additional parties remained limited

partners in KBL.  However, when the letter was brought to the attention of Time Warner Cable,

it corrected the information.  Tietjen Decl. ¶ 12, Ex. 11; Bradley Decl. [Docket No. 25] ¶ 2, Exs.

C-E.

Additionally, Minneapolis alleges that KBL's filings with the Minnesota Secretary of

State show lack of diversity.  However, Minnesota statutes do not require these filings to remain

completely updated, so long as the partnership's general partner is listed.  See Minn. Stat.

§§ 322A.11-12.  In this instance, Time Warner Cable is accurately reflected as the general

partner.  Minneapolis points to no authority to suggest that Minnesota Secretary of State filings

are dispositive in terms of determining the citizenship of partnerships for federal court diversity purposes. Similarly, Minneapolis contends that Time Warner Cable can not be the sole partner in a limited partnership. However, Minneapolis is unable to cite any authority for this proposition. Minnesota law requires that a limited partnership be formed by two or more persons. Minn. Stat. § 322.01. However, partnerships may be consolidated, and Minn. Stat. § 322A.34 expressly allows a single entity to exist as both a limited and general partner. Thus, the fact that Time Warner Cable controls the KBL partnership does not destroy diversity.

Finally, Minneapolis claims that KBL's alleged failure to obtain approval from Minneapolis of Time Warner Cable's acquisition of the final 2.64% limited partnership interests requires a finding that KBL is not diverse. Minneapolis relies on language of the Franchise Agreement stating: "This franchise shall not be assigned or transferred . . . nor shall title thereto, either legal or equitable or any right, interest or property therein, pass to or vest in any person . . . without the prior written consent of the city council . . . ." Franchise Agreement Art. II, § 12. However, Minneapolis misinterprets the import of the 2.64% limited partnership interest transfer to Time Warner Cable. The partnership agreement holds that the franchise itself is granted to the partnership, and not any specific partners; moreover, it states that no partner owns any interest in partnership property. Consequently, the transfer of the 2.64% limited partnership interest was not a conveyance of an interest in the franchise requiring approval from Minneapolis.

Even if the transaction were found to be subject to prior approval from Minneapolis or if it did not comport with Minnesota partnership law, Minneapolis does not cite any authority which would suggest that the transaction was void. The evidence demonstrates that Time Warner Cable was the sole party to hold interests in KBL on the day the lawsuit was filed.

8

Because Time Warner Cable had full control over all partnership interests in KBL prior the filing

of the instant lawsuit, the citizenship of KBL is the same of Time Warner Cable – Delaware and

Connecticut.  Thus, diversity of citizenship has been adequately demonstrated.  Because

Minneapolis stipulated at oral argument that the case is worth in excess of $75,000, Minneapolis'

Motion to Remand must be denied.

**2.      Forum Selection Clause**

Minneapolis also argues that a venue selection clause in the Franchise Agreement

mandates Minnesota state courts as the sole forum for resolution of disputes.[2]  The clause at

issue states:

> The company . . . shall designate an agent within the city upon whom process against
> them may be served on behalf of the city of any other party in enforcing this franchise or
> in asserting any other right or claim.  The company . . . for such purposes, and any other
> purposes, hereby consent to, and submit to, the laws, jurisdiction and courts of the State
> of Minnesota; provided, however, that [the company] shall not be construed to be doing
> business within the State of Minnesota solely as a result of this provision.

Franchise Agreement Art. I, §§ 24.  Minneapolis avers this clause mandates Minnesota state

courts as the sole forum for resolving disputes arising out of the Franchise Agreement.

"Forum selection clauses are prima facie valid and are enforced unless they are unjust or

unreasonable or invalid for reasons such as fraud or overreaching."  M.B. Rests., Inc. v. CKE

Rests., Inc., 183 F.3d 750, 752 (8th Cir. 1999).  Federal courts distinguish between mandatory

and permissive forum selection clauses.  McDonnell Douglas Corp. v. Islamic Republic of Iran,

758 F.2d 341, 345-46 (8th Cir. 1985).  While a mandatory selection clause uses specific

---

[2] Minneapolis raises this argument in a Supplemental Memorandum of Law [Docket No.
34] filed 44 days after the suit was removed to this Court, or 14 days after the 30 day limit on
objections to removal.  28 U.S.C. § 1446(b).  In the interest of completeness, Minneapolis'
argument will be addressed despite its untimely assertion.

language to clearly designate a forum, permissive clauses merely provide a consent to jurisdiction and venue, but do not require a specific forum.  <u>Florida State Bd. of Admin. v. Law Eng'g and Envtl. Services, Inc.</u>, 262 F. Supp. 2d 1004, 1009 (D. Minn. 2003) (citations omitted).

Here, the forum selection clause is permissive, not mandatory.  This is indicated by the lack of specific language indicating that the clause is mandatory, such as "exclusive," "sole," or "only."  <u>Id.</u> at 1010.  No language exists in the clause that designate Minnesota state courts as the sole forum, and no language forbids disputes from being resolved in federal court.  As a result, Minneapolis' Motion is denied.

**C.     Motion to Dismiss**

**1.     Claim for Percentage of Cable Revenues**

Minneapolis' first claim in its Complaint is based on an alleged breach of the Franchise Agreement.  In a letter dated April 21, 2005 to the Defendants, Minneapolis claimed the Defendants had wrongfully withheld payment on revenues derived from cable modem services. Minneapolis bases its claim on language from the Franchise Agreement stating it is entitled to a: "franchise fee of five (5) per cent of the company's gross annual revenues."  Franchise Agreement Art. I, § 9(a).  The Franchise Agreement defines gross annual revenues as: "all revenue derived directly or indirectly by the company . . . from or in connection with the operation of the cable communications system . . . ."  <u>Id.</u> at § 2(p).  Minneapolis argues this language requires Defendants to pay five per cent of all gross revenues to Minneapolis, no matter how the revenues were generated.

In response, Defendants argue that the language of the Franchise Agreement is preempted by federal law.  It is well established that: "State law is preempted when Congress expressly

prohibits state regulation, when Congress implicitly leaves no room for state involvement by pervasively occupying a field of regulation, and when state law directly conflicts with federal law." Chapman v. Lab One, 390 F.3d 620, 624 (8th Cir. 2004) (citations omitted). Indeed, Congress explicitly stated in the Telecommunications Act that: "any provision of any franchise granted by such [franchising] authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded." 47 U.S.C. § 556(c). Because Congress has expressly preempted state law when it conflicts with the Telecommunications Act, the strictures of the Telecommunications Act must govern the Franchise Act in the instant case.

Section 622(b) of the Telecommunications Act makes clear that franchising authorities may collect franchise fees on revenues derived from "cable services." Thus, the determinative question is whether cable modem services fall under the rubric of "cable services." In 2002, the FCC answered this question in the FCC Ruling, which stated: "Given that we have found cable modem service to be an information service, revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined." FCC Ruling ¶ 105. The Court finds the FCC's interpretation of "cable services" to be reasonable, as it was based upon analysis of the Telecommunications Act, cable modem service, and legislative history. FCC Ruling ¶ 4 ("consistent with statutory mandates, the Commission's primary policy goal is to 'encourage the ubiquitous availability of broadband to all Americans'"), ¶¶ 34-59. Finally, other courts have determined that the FCC Ruling on the scope of "cable services" is reasonable. See Parish of Jefferson v. Cox Communications Louisiana, LLC, No. Civ. A. 02-3344, 2003 WL 21634440 (E.D. La. July 3, 2003); City of Chicago v. AT&T Broadband, Inc., No. C2-C-7517, 2003 WL 22057905 (N.D. Ill. Sept. 4, 2003); Time

<u>Warner Cable-Rochester v. City of Rochester</u>, 342 F. Supp. 2d 143 (W.D.N.Y. 2004).[3]

Minneapolis contends that § 622(b) only limits franchise fees on cable services, but not other services provided by cable companies, such as information services, which it argues are governed under Title I, as opposed to Title VI, of the Telecommunications Act. This interpretation mischaracterizes § 622(b). Franchise fees have been defined, for purposes of this statute, as "any tax, fee, or assessment of any kind imposed by a franchising authority . . . on a cable operator." 47 U.S.C. § 542(g)(1). Thus, a fee of virtually any kind targeting cable providers, such as the one at issue here, is a franchise fee. Minneapolis also cites other portions of the Telecommunications Act, as well as Minnesota state law, in support of its argument that it has the authority to assess franchise fees on all of Defendants' revenue. Essentially, Minneapolis' argument is an end run around preemption. The FCC and numerous courts have found that under the Telecommunications Act, Congress intended that cable modem service revenues are not to be included in the assessment of franchise fees. Under Minneapolis' analysis, however, Congressional intent is completely defeated if a franchising authority can simply cite to another federal law or state law as authority to charge what Congress forbids under the Telecommunications Act. Therefore, Minneapolis' arguments that it has authority under state or federal law to reach Defendants' revenues derived from cable modem services must fail, and Defendants' Motion to Dismiss on this count must be granted.

**2.      Conversion Claim**

Minneapolis alleges that Defendants have wrongfully converted channel capacity

---

[3] Minneapolis argues that no weight should be given to any of these decisions, as they are unpublished and are not binding on this Court. Although not of precedential value, the reasoning set forth in these decisions is persuasive, and indicates the strength of Defendants' arguments.

reserved for PEG channels.  Under Minnesota law, two elements must be shown to maintain a conversion claim: (1) plaintiff holds a property interest; and (2) defendant deprives plaintiff of that interest.  <u>Williamson v. Prasciunas</u>, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003).  For multiple reasons, Minneapolis' claim must be dismissed.

First, Minneapolis' claim exceeds the six year statute of limitations on conversion actions.  Minn. Stat. § 541.05(4).  Minneapolis contends that Defendants have wrongfully withheld channel capacity since the construction of the cable system in 1982.  Compl. ¶ 26.  Thus, the statute of limitations on the claim has long since expired.  Although Minneapolis relies on the continuing tort theory in an attempt to escape the statute of limitations, analysis reveals that this theory does not apply here.  The continuing tort theory holds that a statute of limitations does not begin to run until the last act of a tort has been committed.  <u>Lecy v. Burlington Northern & Santa Fe Ry. Co.</u>, 663 N.W.2d 589, 595 (Minn. Ct. App. 2003).  Although Minneapolis cites <u>Williamson</u> in support of this proposition, the facts of that case are not analogous.  In <u>Williamson</u>, the plaintiff was unaware of who had converted her property because the defendant fraudulently concealed it from her; thus, the statute of limitations did not begin to accrue at the time the property was converted, but rather when the plaintiff became aware who had done the conversion.  661 N.W.2d at 652.  No authority suggests that Minnesota courts have extended the continuing tort doctrine to situations in which conversion is open, public, and known to the plaintiff.  Finally, as the <u>Lecy</u> court noted, "federal courts have limited the application of this doctrine to situations where 'the harm is definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress.'"  <u>Lecy</u>, 663 N.W.2d at 595.

Here, according to the allegations of the Complaint, Defendants have been converting

channel capacity for over twenty years.  As Defendants were the only possible party who could

convert channel capacity, and there is no allegation that Minneapolis was somehow unaware of

the alleged conversion or that Defendants fraudulently hid the conversion from Minneapolis, the

continuing tort liability theory does not apply in this instance.  See Franklin Auto Body Co. v.

Wicker, 414 N.W.2d 509, 512 (Minn. Ct. App. 1987); Dunahugh v. Envtl. Sys. Co., 2 F.3d 817,

821 (8th Cir. 1993).  Consequently, Minneapolis' claim is dismissed as time barred.

Even if Minneapolis' conversion claim was not barred by the applicable statute of

limitations, it can not stand because it is based on an alleged breach of contract.  Where "the

gravamen of the complaint is the breach of contract," a cause of action for conversion will not

lie. McNeill & Assocs., Inc. v. ITT Life Ins. Corp., 446 N.W.2d 181, 185 (Minn. Ct. App.

1989).  Although Minneapolis argues its claim sounds solely in tort, its conversion claim could

not stand but for the existence of the contract.  In its own brief in opposition to Defendants'

Motion, Minneapolis states that "[Time Warner Cable] has ignored its contractual obligation . . .

and used a valuable public asset for its own private purposes and presumably pecuniary gain."

Pl's Mem. of Law in Opp. to Defs' Motion to Dismiss [Docket No. 30] at 30.  Additionally,

Minneapolis relies on language from the Franchise Agreement in constructing their defense to

Defendants' Motion.  Id. at 31.  In fact, Minneapolis would not have a claim if not for the

additional channel capacity promised to them in the Franchise Agreement.  Because

Minneapolis' claim arises from the contract, the conversion claim must be dismissed.[4]

---

[4] Finally, it is not clear "system capacity" is the type of property that can be converted.
Minnesota courts do recognize that some forms of intangible property can be converted, such as
stock certificates, checks, and savings books.  However, these types of intangible property are all
represented by documents.  It is not clear that the property that has allegedly been converted in
the instant case falls under this rubric.

Because the statute of limitations has expired and because its conversion claim sounds in contract, Minneapolis' conversion claim must be dismissed.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion to Remand [Docket No. 22] is **DENIED**;

2. Defendants' Motion to Dismiss [Docket No. 7] is **GRANTED**; and

3. Plaintiff's Complaint [Docket No. 1] is **DISMISSED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  November 10, 2005.

15